**UNITED STATES of America**
**v.**
**SWIFT & COMPANY.**

**UNITED STATES of America**
**v.**
**NATIONAL BISCUIT COMPANY.**

**UNITED STATES of America**
**v.**
**The GREAT ATLANTIC AND PACIFIC TEA COMPANY.**
**Civ. Nos. 8862–8864.**

United States District Court
D. Maryland, Civil Division.
July 3, 1957.

George Cochran Doub, Asst. Atty. Gen., Washington, D. C., Leon H. A. Pierson, U. S. Atty., Baltimore, Md., and Marvin C. Taylor, Sp. Litigation Counsel, Dept. of Justice, Washington, D. C., for plaintiff.

David R. Owen and Semmes, Bowen & Semmes, Baltimore, Md., and Earl G. Spiker and William D. Thompson, Washington, D. C., for defendant, Swift & Co.

William L. Marbury, John Martin Jones, Jr., and Piper & Marbury, Baltimore, Md., for defendants, National Biscuit Co. and The Great Atlantic & Pacific Tea Co.

M. R. Garstang, Gen. Counsel, National Milk Producers Federation, Washington, D. C., amicus curiae.

THOMSEN, Chief Judge.

In these consolidated actions the Government seeks to recover certain payments made to defendants by the Commodity Credit Corporation (CCC), which the Comptroller General of the United States held were not authorized by the applicable statute, 7 U.S.C.A. § 1446, which provides: "The Secretary [of Agriculture] is authorized and directed to make available * * * price support to producers for * * * milk, butterfat, and the products of milk and butterfat as follows: * * * (c) The price of whole milk, butterfat, and the products of such commodities, respectively, shall be supported at such level not in excess of

90 per centum nor less than 75 per centum of the parity price therefor as the Secretary determines necessary in order to assure an adequate supply. Such price support shall be provided through loans on, or purchases of, the products of milk and butterfat." The payments were made as the result of transactions under Announcement Da–112, issued by the Department of Agriculture (Agriculture) on March 9, 1954. The principal questions are whether the transacactions were "purchases", as that word is used in sec. 1446(c), and whether the objectives sought to be accomplished by Da–112 were objectives authorized by the statute.

The Secretary had determined in March, 1953, that dairy products should be supported at 90% of parity during the marketing year April 1, 1953, to March 31, 1954, through the purchase of Chedder cheese, butter, and non-fat dry milk solids. For example, CCC purchased cheese which met grade, size and packaging requirements at 37¢ per pound (for standard moisture cheese) and sold it at 39¢ per pound during that period. Early in 1954, Agriculture announced that during the 1954–1955 marketing year, beginning on April 1, the level of dairy price supports would be reduced to 75% of parity, and that thereafter CCC would buy such cheese at 32¼¢ per pound and offer it for resale at 34¼¢ per pound. Da–112, issued March 9, 1954, announced that during the remainder of March, CCC would contract to purchase cheese at the March purchase price of 37¢ per pound, and simultaneously agree to resell the cheese to the offerers during April at the April sales price of 34¼¢ per pound. The cheese was to remain in the custody of the offerer; "delivery" and transfer of title were to take place at the time of grading or when the offer was accepted by CCC, whichever was later. Title was to revert to the offerer on April 1, if the cheese had been graded prior to that date, or as soon as it was graded, if the grading took place on or after that date. On April 1, or as soon thereafter as the cheese was graded, the offerer was to submit vouchers or invoices, together with grading and inspection certificates, and receive payment of the net difference between the March purchase price and the April sale price, 2¾¢ per pound.

Similar provisions were made for butter, except that Da–112 required that the butter must have been made after January 1, 1953, and that it be graded before acceptance, i. e. before March 31, 1954.

The Comptroller General did not question the sincerity of purpose of the Secretary or of any other Agriculture official. In these cases, Justice, on behalf of the United States, concedes that Agriculture acted in good faith. However, the Comptroller General was of the opinion "that the Da–112 transactions were not premised upon bona fide 'purchases' within the meaning of the Agricultural Act of 1949 and, consequently, that payments thereunder were unauthorized and improper."

Justice, on behalf of the United States, argues (1) that the Da–112 transactions were not "purchases", as that word is used in commercial practice, in the Uniform Sales Act, or in the Agricultural Act of 1949; (2) that the legislative history of the 1949 act and earlier legislation shows that Congress used the word "purchases" in sec. 1446(c) in its ordinary meaning, and intended to prohibit payments under a purchase and resale at a loss program such as Da–112; and (3) that the only objective of the milk and butterfat program provided for in that Act was to assure to producers of milk and butterfat the benefit of the price supports authorized thereby; that the Da–112 program sought to accomplish other objectives not authorized by the statute, and therefore was beyond the authority of Agriculture.

On the other hand, Agriculture supports defendants in their contention that the transactions under Da–112 were reasonably calculated to accomplish the purposes which Congress intended purchases under the 1949 act to accomplish, and came within the meaning of the word

"purchases" as Congress used the word in sec. 1446(c).

### Historical Background.

Since the early 1920s, except during and immediately after World War II and during the Korean incident, Congress has been concerned with farm surpluses and low prices for farm products. Various programs have been undertaken in connection with different crops and agricultural commodities. The Agricultural Adjustment Act of 1938, 7 U.S.C.A. § 1281 et seq., provided limited guarantees of prices, ranging from 52 to 75 percent of parity[1]; it called for "payments to producers" on their normal production of "basic" crops, and authorized loans on "non-basic" commodities, including dairy products.

In 1941, the Steagall amendment to the Agricultural Act of 1938 became effective. It provided that whenever the Secretary should announce the need of encouraging an expansion of the production of any "non-basic" agricultural commodities, such as milk, he should support the price of that commodity at 85% (later 90%) of parity, "through a commodity loan, purchase, or other operation". 15 U.S.C.A. § 713a–8. The use of the term "other operation" in that statute is noteworthy. "Other operations" are not permitted in connection with the price support of dairy products under the 1949 act, 7 U.S.C.A. § 1446(c), quoted above.

Under the Steagall amendment CCC promulgated the OPA sale-and-resale-at-a-loss program, which provided for the purchase of cheese at one price and, without physical delivery, an immediate resale at a lower price. The purpose and effect of the program was to keep the retail price of cheese at a low level, while subsidizing the dairy farmers by requiring that the sums received by manufacturers be passed on to the suppliers of milk. Thereafter, pursuant to Executive Order 9250, issued in 1942, U.S.Code Cong.Service 1942, p. 1259, Agriculture, through CCC, conducted a subsidy program which included both (a) certain direct payments and (b) purchases and simultaneous resales at a loss at differentials equivalent to the direct subsidy assistance. However, near the end of the war, Congress restricted and eventually abolished CCC's authority to pay subsidies or to purchase agricultural commodities for resale to the vendors at a loss.

Commitments to support prices to producers of milk and butterfat were made during World War II to encourage needed production. Wartime demands, however, kept market prices at price-ceiling levels, and no price support purchases were necessary.

During 1948 and 1949, Congress engaged in prolonged debates over various types of assistance to farmers. Production controls, restrictions on the production or marketing of milk, were rejected, as they always have been. The real debate was over what method of supporting returns to farmers should be adopted. Two such methods were proposed: (A) that the Government remove from the commercial market those quantities which would not move into consumption at the support price; or (B) that the entire supply be permitted to move freely into consumption at whatever price it would bring, and that payments be made equal to the difference between the support price and the average market price. The first method is generally called the price support method, sometimes the purchase method, although it may be implemented by non-recourse loans or other operations as well as by purchases. The second method is commonly called the payment or subsidy method.

The Agricultural Act of 1948 (July 3, 1948, c. 827, 62 Stat. 1247) was divided into several parts. Title I dealt with support of prices of agricultural com-

---

[1]. The period 1910 to 1914 is the base period used for determining "parity" under the 1938 act, as well as under the 1949 act. The determination of "parity" is a complicated calculation, but no question is raised in these cases about any of the determinations of "parity" made by the Secretary.

modities during the calendar year 1949; Title II was to become effective on January 1, 1950. Title I directed support "by loans, purchases, or other operations"; Title II authorized support "through loans, purchases, payments, and other operations". Title II, however, never became effective.

The Department of Agriculture planned to institute a production payment program effective January 1, 1950 or sooner if the so-called "Brannan Plan" were enacted. Most dairy farmers objected to the Brannan Plan or any other plan which would allow the market price of cheese and butter to fall, even though the farmer's income was assured by means of a subsidy. They took the position, based upon their wartime experience, that a low market price would indicate to the average consumer that the product was relatively inexpensive, and that, if the subsidy were ever removed and an increase in the market price resulted, consumers would feel that the farmers were gouging them and consumer resistance would arise. Moreover, public sentiment in this country has generally been against direct subsidy payments.

The result of the debate was the passage of the Agricultural Act of 1949, 7 U.S.C.A. § 1421 et seq., which is the statute involved in this case. The wording of the statute and its legislative history show clearly that it was intended to be a complete repudiation of the production payment plan advocated by Secretary Brannan and of all other plans based upon a free market determination of farm prices and subsidy payments to farmers. It enacted a continuing program of price support of agricultural commodities.

The Purchase Method of Price Support.

For its price-support effects, the purchase method relies upon removing from the markets all of the supplies produced in excess of consumption and commercial exports at prices corresponding to the support level.

Dairy price supports present special problems. Since milk and butterfat are highly perishable, it is not practicable to purchase them directly from the farmer. However, farm prices for milk and butterfat are closely related to the prices for manufactured dairy products, and the prices for various manufactured dairy products are closely related to each other. Because of this relationship, the farmers' prices can be supported with reasonable effectiveness by supporting the prices of manufactured dairy products.

All of the milk and butterfat produced in excess of the volumes that can be marketed commercially in the forms of milk and its products tends to be used in the production of the products purchased under the support program. Therefore, purchases of those products tend to support prices to producers for milk and butterfat in all uses.

The Agricultural Act of 1949.[2]

Congress specified the permissible methods and levels of such price support, but made no attempt to limit the Secretary's discretion with respect to the formulation of price support programs, so long as they embody authorized methods and undertake to support prices at or within the limits of the stated levels. Thus, 7 U.S.C.A. § 1421(b) provides that, except as otherwise specified, "the amounts, terms, and conditions of price support operations and the extent to which such operations are carried out, shall be determined or approved by the Secretary". Sec. 1429 provides that "determinations made by the Secretary under this Act shall be final and conclusive" as long as "the scope and nature of such determination" is not inconsistent with the Commodity Credit Corporation Charter Act (15 U.S.C.A. § 714 et seq.).

2. Ch. 35A of 7 U.S.C.A. deals with price support of agricultural commodities. Subch. 1, secs. 1421–1432, contains general provisions. Subch. 2, sec. 1441, deals with basic agricultural commodities, and subch. 3, secs. 1446–1449, with non-basic agricultural commodities, including milk, butterfat and the products of milk and butterfat.

Sec. 1446 directs the Secretary to provide price support to producers for whole milk, butterfat and the products of such commodities at such level between 75% and 90% of parity "as the Secretary determines necessary in order to assure an adequate supply", and to provide such support "through loans on, or purchases of, the products of milk and butterfat". "Payments" and "other operations" are not authorized. This section requires a series of administrative determinations. The Secretary must first determine what level of support is necessary to assure an adequate supply; he must next decide what products of milk and butterfat CCC shall purchase (or make loans on) and what grades, sizes, etc. of such products shall be accepted; and finally he must translate the milk and butterfat support level into a dollars and cents purchase price (or loan value) for the products of milk and butterfat he has decided to accept.

Sec. 1427 places certain limitations on the sale by CCC of basic and storable non-basic agricultural commodities, but none on the sale of non-storable, non-basic commodities. Sec. 1431 provides: "In order to prevent the waste of food commodities acquired through price support operations which are found to be in danger of loss through deterioration or spoilage before they can be disposed of in normal domestic channels without impairment of the price support program, the Secretary of Agriculture and the Commodity Credit Corporation are authorized, upon application by the Munitions Board or any other Federal agency and on such terms and under such regulations as may be deemed in the public interest, to make such commodities available to any such agency for use in making payment for commodities not produced in the United States. Any such commodities which are not disposed of pursuant to the foregoing sentence may be made available by the Secretary and the Commodity Credit Corporation at the point of storage at no cost, save handling and transportation costs incurred in making delivery from the point of storage, as

follows in the order of priority set forth: First, to school-lunch programs; and to the Bureau of Indian Affairs and Federal, State, and local public welfare organizations for the assistance of needy Indians and other needy persons; second, to private welfare organizations for the assistance of needy persons within the United States; third, to private welfare organizations for the assistance of needy persons outside the United States. Oct 31, 1949, c. 792, Title IV, § 416, 63 Stat. 1058." Agriculture may make them available for use in making payment for commodities not produced in the United States, or may give them away to school-lunch and domestic and foreign relief programs.

Sec. 1426 requires the Secretary "insofar as practicable" to announce the level of price support "in advance of the beginning of the marketing year" during which such support level will be applicable. The price so announced may not thereafter be lowered, even if it is found to be in excess of the maximum permissible level on the basis of statistics thereafter available.

The Normal Program Under the Act.

Pursuant to the Act, Agriculture established certain policies and made certain administrative determinations to implement the outline program afforded by the statute. Those policies were embodied in Docket RCP 98a, which covered the marketing year April 1, 1950, to March 31, 1951, as well as a prior interim period. Aside from minor changes, those policies continued in force up to and including Docket UCP–98a, which covered the marketing year 1953–1954. They will be referred to herein as the normal program.

The price which CCC was authorized to pay for such products of milk and butterfat as the Secretary decided to include in the program were fixed at figures which in the Secretary's judgment would enable the manufacturer of the product to make and sell it at a reasonable profit, after paying to the farmer-producer the desired price for his milk

or butterfat. Over the years the only products which have been selected are cheese, butter, non-fat dry milk solids, and in one year evaporated milk. Butter and cheese are the only products involved in these cases.

The announcements of the purchase program for the marketing year 1953–1954, Da–99 for butter, and Da–100 for cheese, stated that CCC would purchase the selected products at their respective support prices, provided they met specific requirements as to type, size, grade, and packaging. Cheese was acceptable only in certain large sizes (Cheddars, flats, twins and rindless blocks) weighing from 20 to 70 pounds. Both cheese and butter had to be offered in car lots or storage lots.

Cheese can be properly graded only after ten days from the date of manufacture. Grading certificates showing that the offered goods met all specifications as to type, grade, size, weight, and packaging had to accompany the offer. Cheese might be offered on either a "standard moisture basis" or on a "dry basis". Dry basis prices were higher than standard moisture basis prices. Physical delivery was effected shortly after CCC's acceptance of the offer, sometimes by delivery to a CCC warehouse, which might be a designated portion of the offerer's warehouse, sometimes by delivery directly to a vendee or donee of CCC. Payment by CCC was often delayed for an interval of several weeks for checking, auditing and clearance of the transaction.

Some cheese manufacturers carry out the entire manufacturing process from milk to finished product. Some carry out only part of the operation, and then sell their product to other concerns, known as "assemblers", which complete the manufacturing process. The term "handler" is sometimes used in the trade and by Agriculture to refer to a concern which buys and sells cheese, butter or nonfat dry milk solids at wholesale. But the term does not have any uniform meaning in the dairy industry, being used in different senses in different statutes, dockets, announcements and regulations.

Butter is produced by 3,000 creameries throughout the country. Some creameries are cooperatives whose members are farmers; other creameries are cooperatives whose members are other cooperatives; still others are operated by industrial concerns, such as defendant Swift & Company.

Under the normal program all or nearly all offers of butter or cheese were made by manufacturers, assemblers or handlers who dealt in cheese and butter at wholesale. But CCC stood ready to buy, throughout the entire marketing year, all butter and cheese meeting its specifications, offered at the support price announced at the beginning of the year, without regard to the identity of the offerer, or the source or age of the cheese.

It was never made a condition of purchases from manufacturers or handlers or others that they warrant or certify that they had paid the support price (or its equivalent adjusted to the base grade) for the milk or butterfat which they had used in making the cheese or butter offered to CCC. No investigative practices were established to check up on whether this had actually been done.

The announced price support levels from early 1949 through March 1954 ranged from 79 to 90% of the parity equivalent price of manufacturing milk and from 86 to 90% of the parity price of butterfat in farm-separated cream. Support prices of the selected products have also varied from year to year. For example, the price for standard moisture content cheese rose from 31¢ for the marketing year 1950–1951, to 36¢ for 1951–1952, and to 38¼¢ for 1952–1953, then fell to 37¢ for 1953–1954 and to 32¼¢ for 1954–1955. There was no distinction as to price beween aged or cured cheese on the one hand and current cheese on the other.

Dairy products acquired under the support program are offered for sale back to the commercial market at prices moderately above the current purchase prices.

This sales price policy aims to encourage normal commercial storage of supplies from the spring and summer heavy producing months to the winter period of seasonally low production. Whenever the supplies acquired under the program exceed the quantities that likely can be returned to the markets, the products are made available for other uses.

Milk and butterfat and the products thereof were declared to be "non-storable", and, therefore, not subject to the resale price restrictions, which sec. 1427 placed on sales by CCC of "basic" and "storable nonbasic" agricultural commodities. Offers to buy from CCC had to be in carlots, and specific as to storage lot designation, location and price. "Dry basis" prices were higher than "standard moisture basis" prices, but there was no distinction as to price between aged or cured cheese and current cheese. The offer had to be accompanied by a check in payment. CCC would generally cooperate with a party who wished to purchase from CCC the identical cheese or butter which he had previously sold to CCC, provided CCC still had it on hand. If CCC had disposed of the requested goods before receipt of the offer, it could make a counter-offer of similar material, which was subject to acceptance within one business day. If a contract was arrived at, there were frequent delays of several weeks before delivery was made to the purchaser.

Price support purchases of dairy products were equivalent to about 2.5% of the total milk supply from 1949 until March, 1951. Only small purchases were necessary in 1951–1952 and in the first nine months of the 1952–1953 marketing year. Meanwhile, about half of the butter and a substantial quantity of the cheese acquired under these programs were sold back to the domestic market, and the rest was disposed of through school lunch and domestic welfare programs, and donations or sales at reduced prices for foreign welfare uses.

During the last three months of the 1952–1953 marketing year, CCC purchased substantial quantities of dairy products. Some of these products had been produced in the preceding months of seasonally large production and placed in storage by manufacturers or handlers. Total price support purchases were equivalent to about 3.5% of the total farm marketings of milk and butterfat during that marketing year.

In view of such heavy sales, Secretary Benson considered the possibility of lowering the support level during the ensuing marketing year. But after assurances that the industry would work on programs to reduce CCC purchases, the Secretary announced on February 27, 1953, that milk and butterfat would be supported at 90% of parity for the marketing year commencing April 1, 1953. The Secretary called attention to the surpluses of dairy products which were rapidly building up, and stated in effect that CCC would not be able to continue indefinitely purchasing such large quantities. On March 12, 1953, the Secretary announced the dollar and cent purchase price for cheese and butter; although the support level remained the same, the prices were lowered $1\frac{1}{4}\cent$ per pound in the case of cheese and $2\cent$ per pound in the case of butter, due to a decrease in the parity index.

Docket UCP–98a, effective April 1, 1953, which established the 1953–1954 support program, was implemented by several announcements, including: Da–99, which was a standing invitation for offers to sell butter to CCC at prices varying by grade and from city to city; Da–100, which was a standing invitation for offers to sell standard moisture cheese to CCC at $37\cent$ (with suitable adjustments for dry basis cheese); and Da–107, which was a standing invitation for offers to purchase butter and cheese from CCC at prices to be announced each month, which were always $3\cent$ above the price at which CCC would purchase butter, $2\cent$ in the case of cheese.

As the marketing year progressed, it became increasingly clear that the industry was developing an uncontrollable surplus of milk, butterfat and their products. In view of the warning contained

in Secretary Benson's announcement of February 27, 1953, the industry realized that support levels for the 1954–1955 marketing year would probably be substantially decreased. Some months prior to April 1, 1954, therefore, the industry began to take steps to protect itself from the drop in prices which it knew would undoubtedly follow. Swift's activities were typical. That company began to reduce its butter and cheese inventories by selling to CCC. Production was shifted from small styles into large size Cheddars, for sale to CCC. Under Da-100, the announcement in force at that time, they could not sell to CCC the small style Cheddar cheeses, which were made for sale to the trade. In December, 1953, the price received by the farmer for his milk began to fall. From December, 1953 to January, 1954, the price fell 3¢ per hundredweight. From January to February the price fell an additional 9¢ per hundredweight. Agriculture had reason to believe that the price of milk would continue to fall during March, especially since there was usually a seasonal drop in price during March and April.

The level to which the price of milk might have been expected to fall is difficult to determine. The evidence shows that there is strong competition among dairies, creameries, and manufacturers of dairy products to purchase "fluid milk" and "manufacturing milk" from farmers. "Manufacturing milk" is fluid milk intended to be used for manufacturing dairy products. Farmers have few term contracts, written or oral, with dairies, creameries and manufacturers. All of the large dairies and manufacturers keep agents in the field, urging "their" farmers to continue to sell milk to them. The price paid for manufacturing milk is usually fixed by the purchaser twice a month, covering deliveries during the past half month. The prices paid by different purchasers naturally tend to run about the same in any given marketing territory, but they are not fixed by any authority or group. There was pressure, therefore, on the dairies

and manufacturers to keep up the price they paid to farmers, even though the market price of butter and cheese was falling, especially since the creameries and manufacturers could sell to CCC their surplus production of butter and much of their surplus production of cheese.

The price of small style cheese fell more rapidly during the months of December and January than the price of large style Cheddars which could be sold to CCC.

On February 15, 1954, the Secretary announced that the prices of milk and butterfat would be supported during the forthcoming marketing year at 75% of parity. On February 18, 1954, the actual dollars and cents purchase price for the 1954–1955 marketing year was announced to be 57½¢ per pound for butter (a decrease of 8¼¢ per pound) and 32½¢ per pound for cheese (a decrease of 4¾¢ per pound). As had been anticipated by Agriculture, sales of butter and cheese to CCC increased.

At the time of the announcement of the new support levels, some thought was given to the question of whether the Department should make any change in its policies with respect to the resale of products purchased by CCC. After considering the numerous factors involved, the Secretary determined that the interests of the program as a whole would be best served by continuing to resell all cheese and butter at the standard markup, 2¢ per pound for cheese, 3¢ for butter, even though some concerns were in a position to sell to CCC carlots of cheese and butter in March and repurchase the same or similar lots in April.

Ordinarily the Department has announced its sales prices for each month at the beginning of that month or near the end of the preceding month. Industry representatives advised the Secretary that an earlier announcement of its April, 1954, sales prices would eliminate the uncertainty in the program and help the industry to plan its marketing operations. The Secretary complied, and the March 4 press release stated that

CCC sales prices in April under the new program would be above the announced CCC buying prices in April by the same amounts that its March sales prices were above its March purchase prices.

### The March 1954 Amendments to the Program.

The Department was faced with a number of troublesome problems and pressures in the latter part of February, 1954. The price of milk was continuing to fall, although it was still well above the April support price. Large quantities of butter and cheese were being sold to CCC, and the Department feared that some concerns, at least, would sell to CCC during March not only their surplus butter and cheese, but a part of their regular inventories as well. Such concerns might buy back in April a part of the butter and cheese so sold, or might permit their inventories to remain abnormally low in the latter part of March and the first part of April, even at the risk of losing some sales to the trade. It is hard to believe that such concerns as the defendants herein would risk their dearly bought goodwill and position in the trade for such a comparatively paltry saving, especially in view of the competition between butter and margarine, and between cheese and competing products; but I cannot find that there was no basis at all for the Secretary's fears that certain concerns might strip their inventories to such an extent that normal consumption would be temporarily reduced or impeded. Manufacturers and handlers of small styles of cheese were also unhappy, because they were unable to share in the existing program.

To meet these problems and pressures, the Department did three things:

1. It decided to permit sellers to offer cheese to CCC before grade certification was completed. Accordingly, on March 9, 1954, Da–100 was modified to permit certification in April of cheese offered in March. Since cheese must be ten days old before it can be properly inspected and graded, and since the volume of offers expected during March, 1954, would put a heavy burden on the inspectors, it was not only apparent that no cheese manufactured during the last ten days of March could be sold under the 1953–1954 program, but it was also feared that it would be practically impossible to inspect and qualify some of the cheese made during the middle of March unless the time for inspection were extended.

The purpose of this modification was to help maintain prices paid to farmers for milk throughout March. Agriculture believed, with some justification, that if this modification had not been made, cheese factories would have lowered their prices to farmers for milk delivered before March 31 even further than they did. Don S. Anderson, Director, Livestock and Dairy Division, Commodity Stabilization Service, testified [3] before a Subcommittee of Government Operations of the House of Representatives, 84th Cong., 1st Sess., as follows, p. 22: "The cheese factory, of course, determines the price that it pays farmers on the basis of what it can get for the cheese. The Department, I am sure, felt, and in its announcement for the 1953–54 program was saying to farmers, 'We will attempt to maintain prices at 90 percent of parity through all of March.' Had this change not been made, the information we had from the cheese-producing territory indicated that the price to farmers would have fallen more rapidly than it did under this program. The purpose of this was to permit the farmer who sold milk during the latter part of March 1954 to get more nearly 90 percent of parity for that milk than he would have gotten had this change not been made."

The late inspection feature was also included in Da–112. The Government does not contend that this feature of itself rendered the Da–112 transactions illegal. Many sales of cheese were made

3. Anderson became ill before these cases were reached for trial, but his testimony before the committee was admitted in evidence over the Government's objection.

under Da–100 as so modified, and those transactions are not challenged here.

2. The second decision made by the Department was to set up a simultaneous purchase and resale program. This program was announced in a press release on March 4, 1954, and was embodied in announcement Da–112, which was issued on March 9, 1954.

Each transaction under Da–112 took the form of a combination offer, made between March 9 and March 31, 1954, to sell cheese or butter to CCC at the established 1953–1954 support price (e. g. 37¢ per pound in case of cheese) and to rebuy the identical cheese or butter at the lower 1954–1955 CCC sales price which had been announced to go into effect on April 1, 1954 (34¼¢ per pound in case of cheese). The standard moisture content price of 37¢–34¼¢ was used for all cheese. All such offers were required to state the amount, location and description of the commodity offered. Offers so submitted which met the requirements of Da–112 were to be accepted within two days after receipt, "but in no event later than March 31, 1954". The grades, weights, sizes and minimum quantity requirements for commodities offered under Da–112 were the same as those specified in the standard purchase announcements. So were the inspection procedures and packaging requirements for butter and nonfat dry milk solids. The requirements with respect to cheese, however, were changed to permit inspection after March 31 but prior to May 1, 1954, and to allow Cheddar cheese to be packaged "in any type packaging which protects the commodity in accordance with good commercial practice". The change in packaging requirements saved offerers 1½¢ to 2¢ per pound.

Da–112 provided that "delivery to CCC and transfer of title shall be effected" at the place at which the cheese or butter was inspected. In the case of butter, the time of "delivery and passage of title" to CCC was stated to be the date of acceptance of the offer (not later than March 31), subject to its meeting the

quality requirements. In the case of cheese, the time of "delivery and passage of title" to CCC was stated to be the date of the acceptance of the offer (which had to be in March) or the date on which the cheese was inspected (which might be in March or as late as April 30), whichever was the later. Paragraph 11 provided: "Delivery by CCC Upon Resale To Offerer: Delivery by CCC to offerer shall be effected on April 1 or on the date on which the commodity is delivered to CCC, whichever is later. Delivery of the commodity to CCC in accordance with the paragraph entitled 'Delivery' above shall effect redelivery by CCC to the offerer on April 1 or on the date CCC takes delivery, whichever is later." Thus, in the case of cheese inspected on or after April 1, 1954, the "delivery and passage of title" to CCC and the "redelivery and passage of title" to the offerer occurred at the same instant in April.

The risk of loss was on the offerer from the time of his offer until "redelivery" to him. Storage, carrying, and handling charges were for his account.

The offerer had certain options to modify or to vacate the contract. It was provided that if the CCC domestic sales price for cheese or for butter effective on April 1, 1954, should be greater than the March 31 CCC price support purchase price, the "contract" with CCC might, at the offerer's option, (a) be amended into a contract to sell to CCC under the normal 1953–1954 program, free from any obligation to rebuy, or (b) be declared wholly void.

The reason for the inclusion of these options was the pendency in Congress of several bills to set aside the Secretary's reduction of the support level from 90% to 75% of parity, or to require him to establish support at 100% of parity. Enactment of any of these bills would have caused an upward revision of CCC's April sales prices which would have eliminated the opportunity afforded an offerer by Da–112 to sell to CCC at one price (e. g. 37¢ for cheese) and simultaneously agree to buy back the same

goods at a lower price (e. *g.* 34¼¢ for cheese).

Da–112 also provided that the offerer's right to receive payment was contingent upon his holding the cheese or butter in place, and not selling it to any one except CCC until April 1, 1954, or the date of inspection, whichever was later. It was provided that the offerer's failure to retain the goods for that period "shall render the contract void". The effect of this provision will be discussed below.

Following "redelivery" to the offerer, he submitted to CCC the inspection certificates and vouchers or certified invoices for the difference between the sale price to CCC and the resale price to him, and received payment for that difference on each pound of cheese or butter covered by the transaction.

Anderson testified (p. 14) that this "modification was aimed at helping the industry to keep supplies of dairy products flowing into retail outlets so as to maximize consumption and minimize CCC purchases under the support programs. * * * This modification would speed up the processing and distribution of the products to consumer outlets in early April. If buyers had been required to wait until early April to offer to buy back the products, the time involved in completing the transactions would have delayed distribution and resulted in a shortage of supplies in retail outlets." And again (pp. 23–24): "Had Da–112 never been issued, the same people who sold us cheese in March at 37 cents a pound could have sold us cheese in March at 37 cents a pound and those same people could have bought it back from us in April. The only reason that I recall for issuing Da–112 was to facilitate this in cases where the people knew they wanted to do it, and save some cost of the Commodity Credit Corporation by avoiding the necessity of moving the cheese; we hoped that by these modifications we would encourage the industry to keep the pipelines filled and sell more cheese and therefore reduce the eventual Commodity Credit Corporation purchases; and finally, to save what seemed to us an unnecessary cost to the industry in cases where they had cheese that met Commodity Credit Corporation specifications with respect to everything except packaging, in not forcing them to repackage that cheese in order to sell it to us. The three reasons were to keep the pipelines full in order to at least lessen to some minor degree sales to the Commodity Credit Corporation; to save the cost to the Commodity Credit Corporation of physically moving the cheese into warehouses and then having the trade move it back; and third, to save some costs to industry. You will notice one of the requirements was that it was feasible to repackage the cheese, and we were told—we have no way to check it— that there were quantities of cheese that the industry would have repackaged had we insisted on it. That difference between 4¾ cents minus 2 cents is 2¾ cents a pound, and we were told by the industry that they could well afford to repackage some of this cheese and that they would do it. As I say, Mr. Chairman, we have no positive proof of that, but we find American business pretty reliable, and we trust them. They usually tell us the truth, and for 2¾ cents a pound I rather think they would have done it." Anderson was evidently referring to the difference between the 1953–1954 CCC purchase price, 37¢, and the 1954–1955 CCC purchase price, 32¼¢, not the difference between any CCC purchase price and any CCC sales price. Of course, if an offerer sold the cheese in March for 37¢ and repurchased it in April for 34¼¢, and his repackaging costs were 2¢, his profit would have been only ¾¢. Under questioning by the chairman of the Congressional Committee, Anderson conceded (pp. 33 and 90) that delivery and transfer of title under Da–112 was really just a paper transaction, which ended up with the Government owing the cheese manufacturer 2¾¢ a pound on all the cheese on which he had submitted claims; that instead of the Government buying the cheese from the manufacturer and the manufacturer then buying it back, what

actually happened was that CCC sent the manufacturer a check for the 2¾¢ difference.

One effect of the sale and repurchase feature of Da–112 was to permit concerns holding cheese which had been aged and cured according to their particular needs and which was worth more than 37¢ a pound, to contract simultaneously to sell and repurchase such cheese without any risk that they might not be able to obtain the identical cheese. They were able to obtain the 2¾¢ payment to reduce their inventory costs without any risk of losing their valuable cheese. Some of this aged cheese which would not otherwise have been sold to CCC was made the subject of Da–112 transactions. Some other cheese was included in Da–112 transactions which would not have been sold under Da–100 because of the delay involved in repurchasing the cheese under Da–107 after it had been sold under Da–100. However, much of the cheese and butter which was included in the Da–112 transactions would probably have been sold to CCC under Da–100. Some of this cheese and butter would have been repurchased under Da–107 and some would have been left with CCC. It is impossible to tell what percentage of the cheese and butter included in Da–112 transactions falls into each of these classes.

3. The third decision made by Agriculture was to include small style cheese in the Da–112 program and in the permanent program after April 1, 1954, although small styles had not been included in the program theretofore and were not included in the regular Da–100 program during the remainder of the marketing year ending March 31, 1954. Small styles had been left out of the regular program because ordinarily they were priced higher and CCC thought it would never buy any of them. Anderson testified, p. 36: "It appeared, rather late in the season, I admit, that maybe we were putting somewhat of a burden on the people who had put their inventory into Cheddar cheese of a small style. Now on that basis, we said, 'Yes, you do deserve the same protection as the larger styles.' It was that philosophy. How sound it was—it was one of the less clear cases that we had to face in this transition period." The Dairy Division of the Department, recommending that Da–112 be amended to include small styles, said that it "will provide—the same degree of protection against financial loss on inventories due to the decrease in dairy price support level on April 1 as the program now unavoidably provides with respect to large sizes". The directors of CCC said that the limitation of the program to large styles "has the effect of discriminating against processors who have produced and stored small sizes".

The announcement that small styles would be included in the Da–112 program was made on March 25, 1954. Docket UCP–98a was actually amended on March 29, 1957. The possibility that the inclusion of small styles in the Da–112 program at that late date could have any appreciable effect on the prices paid to farmers for milk delivered during the remaining days of March was so slight as to be imperceptible.

The inclusion of small styles in the general program was undoubtedly within the discretion of the Secretary, and over a long period would probably tend to secure a more even balance of production and to promote sales to and consumption by the public.

I find as a fact that the reasons given by Anderson were the real reasons for the three decisions referred to above, rather than other possible reasons suggested by counsel for plaintiff and defendants respectively or by defendants' expert witnesses.

### Defendants—Payments.

Swift & Company manufactures both cheese and butter. It had been a regular participant in the price support program, and sold a great deal of butter and cheese to CCC under Da–99 and Da–100 through March, 1954. The butter and cheese on which it collected under the Da–112 program were its marginal

stocks, not clearly surplus, and not clearly needed for sale in the first few days of April. Whether they would have been sold under Da–99 or Da–100 is doubtful.

National Biscuit uses cheese aged and cured in various ways for manufacturing its crackers and other products. It does not manufacture or otherwise deal in cheese and had never sold any cheese to CCC under the regular programs.

A & P does not manufacture cheese, but purchases the entire output of certain factories. It does manufacture some butter, and purchases some, and had made occasional sales to CCC.

Payments exceeding $2,000,000 were made under Da–112 for about 86,000,000 pounds of cheese, and payments of over $288,000 for about 5,000,000 pounds of butter. Swift & Company received $14,626.41 on account of 531,871 pounds of cheese and $13,747.43 on account of 282,840 pounds of butter. National Biscuit received $108,693.78 on account of 4,523,722 pounds of cheese; it made no offers of butter. A & P received $93,692.05 on account of 3,406,979 pounds of cheese and $15,880.50 on account of 302,486 pounds of butter.

### Discussion.

I. In considering the validity of the transactions under the March announcements, it is necessary to consider separately the three decisions referred to above, and their respective ends, means and probable effects. Defendants naturally seek to lump them all together, so that the authorized objectives of the one may help sustain the others.

█ The Secretary decided to permit inspection during April of cheese offered in March in order to allow cheese manufactured during the latter part of March to be sold to CCC under the 1953–1954 support program at 37¢ per pound, in the belief that this would help support the prices paid to farmers for milk during March. The evidence is uncontradicted that it did have that effect. Government counsel argues that year to year changes in the support price—up or down—must have been foreseen by Congress, but that Congress made no provision for the transition periods and that the Secretary was not required to make any special provision for such a period. Counsel also notes that the late inspection feature applied not only to cheese produced from milk purchased in March, 1954, but also to cheese produced from milk purchased many months before; and that permitting late inspection of old cheese had little or no effect on the price paid to farmers for March, 1954 milk. It is true that the Secretary might have excluded old cheese from the program; but procedural problems were involved, and the Secretary might reasonably have concluded that a general provision permitting late inspections was necessary to accomplish the desired purpose. The Secretary had wide discretion with respect to the details of the program, so long as he kept within the limitations placed on him by the statute. I conclude that the decision to permit late inspections was within the authority of the Secretary; the amendment to Da–100 embodying that feature was proper; and the inclusion of that feature in Da–112 did not render the Da–112 transactions invalid.

On the other hand, the inclusion of that feature did not render Da–112 valid if it was otherwise invalid. The need for modification of the inspection procedures could have been met within the limits of the regular program, by amendment to Da–100. That amendment was in fact made. The need for modified inspection procedures did not justify the purchase-and-resale-at-a-loss feature of Da–112. The validity of the latter feature depends upon the answers to the following questions: (1) What were the objectives which the Department sought to accomplish by the purchase-and-resale-at-a-loss transactions under Da–112? (2) Were they permissible objectives under the statute? (3) If so, were the means embodied in Da–112 reasonably calculated to achieve those objectives? (4) Were the Da–112 trans-

actions "purchases" as that word is used in sec. 1446(c)?

The reasons given by Anderson for the purchase and resale program—keeping the pipelines full, lessening "to some degree sales of butter and cheese to CCC", saving the cost to CCC of moving the cheese, saving some costs to industry, "reimbursing the processors"—are not undesirable objectives; but the question which must be considered in these cases is whether they are objectives authorized by the statute, or proper means to accomplish the statutory objectives.

■■ The statute directs the Secretary to provide "price support to *producers* for * * * milk, butterfat, and the products of milk and butterfat" (Italics supplied). The general objective of the statute was to support the prices paid to producers, farmers; incidental benefits to manufacturers, processors, handlers and others were not prohibited, but they could not justify any program or procedure which was not calculated to accomplish the general objective of the statute. The broad discretion vested in the Secretary had to be exercised within the limitations placed on him by the statute; he had no authority to seek particular ends simply because he regarded them as desirable; they had to be ends authorized by the act; the means chosen had to be reasonably calculated to achieve those ends, and had to be means which were themselves authorized by the act, namely, purchases or loans.

■■ Agriculture and defendants argue that "keeping the pipelines full" is necessary to maintain a steady level of consumption, and that increasing the domestic consumption of agricultural commodities is an objective authorized by the CCC Charter Act, 15 U.S.C.A. § 714c. The CCC Charter Act and the Agricultural Act of 1949 must be read together, although the broad powers given to CCC, so that it could carry out many different statutory programs, cannot cancel any limitations which Congress placed on the Department in carrying out a particular program. The Secretary is entitled to consider the long range objectives of a program as well as the short range objectives; and increasing or maintaining the consumption of butter and cheese was a proper long range consideration.

Minimizing sales of butter and cheese to CCC under Da–99 and Da–100 was a proper objective, as tending to reduce the ultimate costs to the taxpayers, although it is debatable whether that result was achieved by Da–112, or was likely to be achieved by it, in view of the large amounts of cheese and butter which were included in the Da–112 transactions which would not have been sold under Da–99 and Da–100. Moreover, there were other ways of minimizing the sales of butter and cheese on CCC. One of these, delaying the announcement of the prices at which CCC would sell butter and cheese in April until the usual time, around April 1st, would also have helped maintain the price paid to farmers for milk in March. Instead, at the request of the industry, CCC announced the low April sales price early in March; this was bound to have and did have a depressing effect on the price of milk and butterfat and their products.

The saving of unnecessary costs to CCC and to industry were of course desirable objectives, if they could be accomplished by a program or procedure authorized by the statute. Savings of costs to industry, reimbursing processors, and affording industry inventory protection, regarded as incidental benefits to persons other than producers are not reasons for condemning a program or a procedure; but they are not legitimate objectives of a program under sec. 1446. There is evidence that they were primary objectives of some of the people in Agriculture.

Small styles were admitted to the program in the last few days of March, in order to give their owners the same inventory protection which had been given to owners of large styles. Agriculture concedes this. Again, the provisions of Da–112 (1) granting options to the offerers to treat the offers as absolute sales

to CCC or to avoid the transactions entirely, if the support price were raised above 37¢ on the first of April, and (2) rendering the contracts void if the offerers failed to keep the butter and cheese in position until the first of April or until they had been inspected (which permitted the offerers to sell to others during March the butter and cheese covered by the Da–112 transactions, without any liability to CCC for breach of contract), were further indications that inventory protection and reimbursement to processors were major objectives of the Da–112 program.

Whether the purchase-and-resale-at-a-loss feature of the Da–112 transactions had any effect on the prices paid farmers for milk is debatable. It was not used as a justification for the program by Agriculture. Dr. Gaumnitz, the industry expert, did not think so. He justified Da–112 because of the confidence it inspired in the integrity of the Department. Dr. Black, the agricultural economist called by National Biscuit and A & P testified as follows: "Those in the cheese trade who actually received the payments of two and three-quarters cents a pound were in a stronger competing position because of having received these payments, and they would bid more strongly for cheese to be further processed, if they were processors, cheese to be assembled if they were assemblers. Operating in this way with more strength they would compete more strongly for cheese from the primary cheese factories scattered around the territory, and this would cause the managers of these small cheese factories, in making their March 31 settlements with their patrons, to pay somewhat more for their milk. That is the way this operation would normally work out in this economic world in which we live. That it did so in this case is indicated by the best analysis that I could make, the data on the behavior of prices paid to producers in the month of March. The two conclusions reinforce each other. Now, that is as close to an answer to that question as any economist can make unless he does a lot of detailed field study out in the actual field of producer and cheese-marketing operation."

█ Improving the competitive position of certain firms against others in the same class was not a proper objective under the Act, although it may have been a permissible means of achieving a proper objective. The firms which were benefited were large concerns, able to offer carlots of butter and cheese, and manned by sufficiently large staffs to be kept fully advised and to be able to take advantage of such last minute opportunities as those afforded by the small styles amendment to Da–112. Some of the firms which offered butter under Da–112 were cooperatives, composed of farmers, and those farmers were benefited by Da–112; but the evidence that any other farmers received any benefits from the purchase-and-resale-at-a-loss features of Da–112, and the small style amendment thereto, is nebulous. Indeed, there were factors in the program which tended to depress prices paid to farmers during March or April, as well as factors which tended to support them. The major sustaining factor, the provision for late inspections, applied to Da–100 transactions as well as to those under Da–112. That factor did not need a purchase-and-resale-at-a-loss program to make it effective, and it cannot be used to sustain Da–112.

It appears, therefore, that the distinctive feature of the Da–112 transactions— the purchase-and-resale-at-a-loss procedure—was not calculated to achieve the main objective of the price support program—the support of prices paid to farmers for their milk and butterfat. Some of the objectives of the Da–112 program clearly would not justify those transactions under the terms of the applicable statute; others, however, were objectives which might properly be sought by the Secretary, provided the means used were "purchases" within the meaning of that word in sec. 1446(c).

II. The Government contends that the Da–112 transactions were not "purchases", as that word is used in commercial practice and in the Uniform Sales Act; that the legislative history of the Ag-

ricultural Act of 1949 and earlier legislation shows that Congress used the word "purchases" in sec. 1446(c) in its ordinary meaning, and intended to prohibit payments under a purchase-and-resale-at-a-loss program such as Da–112.

Defendants contend that transactions under Da–112 had the essential characteristics of any other purchase for the purpose of price support, in that they involved the passage of title for a consideration and the effective removal of the products from the market for a specified period.

■ Words in statutes and contracts are to be given their ordinary meaning, in the absence of controlling considerations to the contrary. Union Pacific Railway Co. v. Hall, 91 U.S. 343, 347, 23 L.Ed. 428; United States v. Wurts, 303 U.S. 414, 417, 58 S.Ct. 637, 82 L.Ed. 932. Many features of the Da–112 transactions distinguish them from ordinary purchases. Possession of the goods never moved from the offerer. Sec. 11 of Da–112 provided, in pertinent part, that "delivery of the commodity to CCC * * * shall effect redelivery by CCC to the offerer on April 1st or the date CCC takes delivery, whichever is later". CCC never had the right to sell or give away the goods to anyone except the offerer.

On the other hand, the offerers were always free to contract to sell the goods to whomever they pleased. Defendants admit that they could make contracts to sell the goods to others in March for delivery in April without violating Da–112. They also might sell the goods in March for delivery in March, or before inspection of the cheese in April, with no other penalty than rendering the Da–112 contract void, as provided in paragraph 9 of Da–112. The Government refers to this provision as an option in the offerer. Defendants say that a sale in March for delivery in March of goods already offered and accepted by CCC under Da–112 would have been a breach of contract by the offerer. Defendants cite cases which hold that the word "void", as used in Da–112, should be construed as "voidable at the option of the injured party", and that the court

should consider for whose benefit the provision was placed in the contract. Stewart v. Griffith, 217 U.S. 323, 30 S.Ct. 528, 54 L.Ed. 782; Williston on Contracts, Rev.ed., sec. 746. They argue that the provision was placed in the contract for the benefit of CCC, and that a sale by the offerer in violation of the condition that the goods be held until April would permit CCC, at its election, to retain title to the product, claim possession, refuse to permit the offerer to repurchase, and assert an action for breach of contract. It is clear, however, that no possible damages could accrue to CCC from the failure of the offerer to hold the goods; CCC would simply be relieved of its obligation to make the 2–¾¢ payment to the offerer called for by the Da–112 contract. The provision must have been placed in the contract to give the offerer an opportunity to cancel the contract without any liability to CCC. In effect, the provision amounted to an option in the offerer to cancel the Da–112 contract at any time by selling the goods to others or otherwise using them in the offerer's business.

The Da–112 contracts also contained provisions which defendants admit were true options in the offerer. Paragraph 10 provided that if the CCC domestic sales price for cheese or butter, effective on April 1, 1954, was greater than the March 31 support purchase price, the contract with CCC might, at the offerer's option, be amended into a contract to sell to CCC free from any obligation to rebuy, or might be declared wholly void.

It is significant that under the Da–112 transactions specially selected or aged cheese worth more than 37¢ per pound could be and was offered and collected for entirely without risk of loss on the part of its owners.

Although it is true that title passed to CCC for a brief period in some cases and momentarily in others, CCC never acquired any true property interest in the commodities covered by the Da–112 transactions. Certainly CCC never had such a property interest in the butter or cheese as would make the transactions bona fide purchases in the ordinary com-

mercial sense or under the Uniform Sales Act.

The legislative history shows clearly that Congress intended to exclude "payments" and "other operations" from the permissible methods of price support for dairy products and to permit only "purchases" and "loans". The legislative history is reviewed in the opinion of the Attorney General of the United States, dated June 9, 1954, addressed to the Secretary of Agriculture, on the subject of Subsidy Payments to Processors of Dairy Products. 41 Op.Atty.Gen.No. 28. It need not be reviewed here. Both Agriculture and defendants concede that if the Da–112 transactions cannot be brought within the meaning of the term "purchases", they are not authorized by Da–112.

Defendants argue that any transactions which accomplish the purposes of the purchase method of price support are authorized. Counsel for National Biscuit and A & P take the position in their brief that "by authorizing purchases Congress intended to empower the Secretary to enter into transactions which would produce the economic phenomena typical of the purchase method of price support, namely the general phenomenon produced in the market as well as the *inter sese* economic phenomenon which distinguishes a particular method of achieving the desired result from other methods". They argue that the economic phenomenon intended to follow from "purchases" is the removal from the market during a relevant period of time of large quantities of the product which would have a depressing effect on market price unless removed. Dr. Black put it more simply: "The term purchase method is understood to mean that the Government agencies like the CCC will buy some of the product and hold it off the market, maybe for a very short period like a few days, maybe for several months, and maybe for even longer."

Defendants argue that a purchase for the purpose of price support involves the passage of title for a consideration and the effective removal of the products from the market for a specified period. The Comptroller General, in his opinion of August 15, 1955, stated: "While the purchase method of supporting prices for dairy products with which we are concerned involves many complicated considerations, it is clear that 'purchase' means an acquisition, if not of full ownership, of a property interest in the commodity which, at the very least, would permit its complete removal from the market. Also, it is clear that the purchase method is to be distinguished from a direct payment without acquisition of any interest in the commodity—the employment of which method the Department of Agriculture has recognized would require additional legislation."

Was there an effective removal from the market of the products covered by the Da–112 transactions? The offers could be made at any time between March 9, 1954, when Da–112 was published, and March 31 of that year. Most of them were made in the latter part of March. Even after the offers were accepted by CCC, defendants admit that they were free to offer the goods to others in March for delivery in April. They were free to sell the butter to any one they chose on and after April 1st, and were free to sell or use the cheese in their business after April 1st or the date of inspection, whichever was later. Moreover, they could use or sell and deliver the goods during March (or before inspection in April) without any penalty except the loss of the 2¾¢. It is a reasonable inference from the evidence that this was done in eight instances, although not by any of the defendants in these three cases. The testimony offered by these defendants indicates clearly that they treated the butter and cheese covered by the Da–112 transactions as available for any purposes on and after April 1, except in the cases where cheese was to be inspected later in April. It is quite unrealistic to say that the butter and cheese covered by the Da–112 contracts were removed from the market in any real sense.

It was clear to every one that these defendants, along with all other concerns

large enough and well enough informed to benefit by the support program, were going to sell their surplus butter and cheese to CCC under the normal program provided.for in Da–99 and Da–100; and they did so. They were also going to retain the products which they needed for normal sales or normal use during the remainder of March; and defendants did retain those current supplies. The only doubt was with respect to the marginal items, whether butter or cheese, which would normally have been sold or used early in April, and which might or might not have been sold under Da–99 and Da–100 and repurchased under Da–107. Defendants and others offered these marginal items under Da–112 transactions for the very reason that they would not thereby be withdrawn from the market at the time when they would be needed, that is, on and after April 1st, which is the only significant period with respect to those items.

I agree with the Comptroller General that the purchase and sale elements of the transaction constituted in effect simply an agreement to pay the difference between CCC's March support purchase price and the CCC April selling price.

Sec. 1429 provides that "Determinations made by the Secretary under this Act shall be final and conclusive * * *". However, the determinations referred to are those made by the Secretary with respect to matters left to his judgment, such as the choice between "loans" and "purchases"; the Secretary had no discretion to make "payments" or engage in "other operations" not authorized by sec. 1446.

The fact that the Secretary and others in the Department sincerely believed that Da–112 transactions were "purchases" cannot make them such if they were not "purchases" within the meaning of that word as used in the act.

Swift & Company, although arguing that all of the Da–112 transactions are valid, also contends that a distinction may be made between the transactions dealing with butter and those dealing with cheese. All butter had to be manufactured during the period January 1, 1953 to March 31, 1954, and had to be inspected in March, 1954, offered in March, and accepted in March. There was, therefore, no possibility of offering goods not in existence, as there was in the case of cheese, although all of Swift's cheese was in existence when it was offered. It is true that the butter transactions come nearer to being purchases than some of the cheese transactions, but they do not come within the meaning of the term "purchases", as that word was used in sec. 1446(c).

### Conclusions.

■ 1. The Da–112 transactions were not "purchases" within the meaning of sec. 1446(c), and were not authorized by the relevant statute.

2. The Government, therefore, is entitled to recover the payments made to defendants in these cases under the Da–112 transactions. United States v. Wurts, 303 U.S. 414, 415–416, 58 S.Ct. 637, 82 L.Ed. 932; Wisconsin Central Railroad Co. v. United States, 164 U.S. 190, 212, 17 S.Ct. 45, 41 L.Ed. 399.

■ 3. The allowance of interest in such cases as these depends upon equitable considerations. Board of Commissioners of Jackson County v. United States, 308 U.S. 343, 350, 60 S.Ct. 285, 84 L.Ed. 313; Billings v. United States, 232 U.S. 261, 34 S.Ct. 421, 58 L.Ed. 596. Certainly no interest should be allowed before the Government demanded repayment. Railroad Credit Corp. v. Hawkins, 4 Cir., 80 F.2d 818, 825. Under all of the circumstances, I conclude that the Government should not recover interest from the defendants except from the date of the judgments to be entered herein, but that the judgments should bear interest at the customary rate of 6%.

The Clerk is directed to enter judgment against Swift & Company for $34,-665.51 in Civil No. 8862; against National Biscuit Company for $108,693.78 in Civil No. 8863; and against The Great Atlantic & Pacific Tea Company for $109,572.55 in Civil No. 8864; all costs in the three cases to be divided equally among the three defendants, and paid by them.